J.P. Kemp, Appellant, 1 Yoloa We have appealed the granting of summary judgment on Mr. Ulloa's disability, discrimination, and failure to accommodate claims, and also an order wherein the district court denied a motion to extend time to object to a magistrate judge's order regarding a discovery matter and then struck our objection to the discovery order from the magistrate judge. With respect to the disability discrimination claim, the court actually found that Juan Ulloa is not a person with a disability, which is kind of impossible, because Mr. Ulloa has, he suffered a back injury on June 4, 2019, when the enormous haul truck he was cut to the quick on this. Your client was given a full paid, basically, while he was on leave. Under our case law, that satisfies. But the question is whether he's disabled under the ADA after Dr. Rayer's report that he has suffered no permanent disability and can return to full-time, full-duty work without restriction. How do you get around that? Well, two things, Your Honor. First of all, he was not paid for the entire time. It was the workers' compensation benefits that he got. And he only got it at — I don't think there's any proof that he got it prior to September 18th of 2019, but they denied him from September 18th of 2019 until sometime in December. So while he was still working on it — So you claim that, contrary to the representations of the defendant, he was not paid during the leave. Is that correct? Certainly not during all of it. September 18th, they cut him off. And he had to actually go through many months — Was that after the doctor gave his note saying he could return full-time without restriction? That happened on October 2nd. So about two weeks later was when Dr. Rayer — You're saying it was a two-week gap, roughly. At least. I don't find anything in the record. And I was under the impression, but as I look at it, I don't find anywhere where they paid him TTD up until that point. Let me ask you this. But I don't find the opposite, either. Where in the record is it that he wasn't paid? Is there something — I mean, I'm trying to — Yeah. I was under the impression that he was paid for the entire time. That's correct. No. So there's an appeals officer decision in order, because they had to — and throughout — in the second volume of the excerpts of record, there are numerous hearing officer decisions in the worker's comp claim where he had been denied — there are temporary total disability benefits throughout that time period. They had to appeal that. Hearing officer reversed some of them, and it ultimately went to an appeals officer. It was the second level of administrative appeal, where the appeals officer ultimately had to rule that he was entitled to those benefits, even during the time after Dr. Rayer came out with this thing on October 2nd. And the reason for that is that if you — Where in our record is it found that he wasn't paid? I believe it's in volume 4 or 5, Your Honor. OK. It's the appeals officer decision in order. Oh, hold on a moment. I can find it here. I have another question for you on the disability. What's the evidence of disability? Dr. Rayer doesn't give you any support for that. So Dr. Rayer's problem is that his entire thing was undermined by Dr. Rapoport, who is an orthopedic surgeon in Reno, when he did an independent medical evaluation. What Dr. Rayer was looking at — and this is important because it brings in worker's compensation down in the weeds a little bit. He was saying, I'm releasing him from a strain injury, a lumbar strain injury. And at that point in time, the claim had been limited to this lumbar strain injury. But we have an MRI report from June that shows herniated discs. So the claim was ultimately expanded to include those herniated discs. Mr. Ulloa has the herniated discs all the way from June, when he gets injured, up until today. Well, I'm aware of the email that talks about he has other problems, but I don't — Yes. Where in the record is the MRI with the herniated disc? The MRI with the herniated disc is at 2ER180. That's the MRI report. That was on June 24th of 2019. Dr. Rayer completely ignored that in his October 2nd report. So four months later — not quite, almost a little over three months later — Dr. Rayer is ignoring the fact that Mr. Ulloa has these herniated discs. And he appears to be doing it because the herniated disc is not — Is there an opinion from an expert or a doctor that say the herniated disc creates a disability? Well, we have the report from Dr. Rapoport, who says that, you know, he is injured, he is restricted. We have an 11 percent permanent partial disability evaluation. We have a functional capacity evaluation. All of these things were later on. It's true. Those were later on. However, Mr. Ulloa's condition didn't change. The MRI showing the herniated disc, that didn't miraculously go away and then come back. Let me ask you this. We've got this functional capacity evaluation a year after he's released, true? It was later toward the end of his claim, yes. Okay. Do we have an expert saying that the situation he was in, his disability, existed at the time of his release as opposed to a year later? I would say that both the opinions of Dr. Rapoport, who said he's had this all the way through — He said — Dr. Rapoport says, in my opinion, this disability existed a year ago. So Dr. Rapoport sees him in January of 2020, so that's about a little over two months, three months after he got fired. That's the soonest they could get him in. And that IME was being scheduled at the time when he got fired, though. And Dr. Rapoport says, yes, he's got a herniated disc that was at least aggravated, if not caused, by the industrial accident on June 4th, 2019. And when's that opinion rendered? In the record. So that's — Dr. Rapoport's report is 2 ER 267 to 274. In the date, 2 ER what did you say? 2 ER 267 through 274 is Dr. Rapoport. I believe it was January 20th. So you're saying Dr. Rapoport's report came after he was fired? Is that correct? It did, but that appointment had been scheduled, and that's what you'll see in the — I understand, but for purposes of the company, what they had was the report of Dr. Rayer, which said he could return with no permanent disability, he could return to full-time work without restriction. You're saying that Dr. Rapoport saw him two months or later after that and said he had a permanent disability. So what do we do with that? When they acted, they acted based upon Dr. Rayer's report, right? What's important about that is the October 4th, 2019 email from the workers' compensation person in the company to the human resources people in the company. And that's at 2 ER 246. And what they say is, yeah, Dr. Rapoport has released him, but he has said he needs to see his own doctor about ongoing problems that he has, and he is being set for an independent medical evaluation coming up. At that point, it was, I think, specific. But that was for purposes of the workers' comp, though, right? Well, yeah, that was — but again, it's saying that he's not completely better. They know that he's not completely better because he's going to see more doctors. But you see that in that. He just says that — he just says there are further medical tests scheduled. Right. It doesn't say he's not getting better. Right. Well, so there are further — I mean, the final — what it says is, if I'm on 246, the final diagnostic testing was negative, showing no nerve damage. He was released for full duty and from care. He has ongoing complaints, and he recommended follow-up.  So he doesn't have nerve damage, but that doesn't address the herniated discs. He's got physically herniated discs, protrusions and herniations.  It says it in the MRI report, which they also have. They also have the MRI report. And what they're — what they're saying there is that, yeah, from the claim standpoint, from workers' compensation claim, if his claim is only accepted for a strain, the strain is better, but he's got the herniated discs, and that gets added into the claim as time goes on. And the workers' comp people working for the company knew that that was the case. They knew that he was seeing other doctors. For the herniated — for the herniated disc. Well, it would have — it doesn't say that specifically about the herniated disc, but that's, in fact, what it ends up being. Well, the email that we're talking about, where it says he has other complaints, it doesn't state that the complaints were about substantially limiting impairments, though, does it? Well, he was complaining that he was still having problems. He was still having pain. I'm talking about the email. The email itself. The information that the company had. The information that the company had — and, again, they were going to his doctor's appointments with him. The information that the company had was that he was going to be seeing other doctors, including his own doctor, for these nerve issues that he was complaining about, or the pain issues that he was complaining about, that they were making determinations more than the claim, which, of course, they changed their mind about that later on. Well, I'm just — I thought you said it was the email that gave them heads up. And the email doesn't say anything other than he has other complaints, right? And that he's seeing — and then he's going to see other doctors. And then, also, he meets with them on the 4th of October and tells them — he's going to the hospital right after that meeting. He says, you know, he's got numbness. He's got all of these issues. He's telling the HR people when he meets with them directly. And that's in the record? It's in the recordings that I think have been submitted, yes. He recorded those meetings. And those recordings, I believe, are in the record, yes. So he doesn't magically get better from October 2nd until he sees Dr. Rapoport. And he sees Dr. Song in there, too, and is given restrictions again. They expand the scope of his claim. This is all going on. And they know that he's continuing to follow up. They know that he's continuing to look at expansion of the claim and continuing to get care because he's having problems, because he's — he's — he's limited. The pain is limiting what he can do. And he asks on October 2nd for an accommodation. And they — they don't have any kind of interactive process with him. And that's important. Again, I think, at least from my problem, is we seem to be looking at a different record, because the record that I see shows that Dr. Rayer says he can return. There's no permanent disability. There are no restrictions. At a subsequent time, you're saying that due to his complaints going to Dr. Rapoport, he says something different. As you know, we see these disability — social security disability cases all the time. Nobody agrees. But the reality is that this company has evidence, based upon Dr. Rayer, that there's no problem. He's done. He can come back to work full-time. Now, the fact that he's complaining, I suppose one would expect that. It happens all the time. But that doesn't change the fact that there was no medical evidence at the time of his firing that he had any of the problems that you're talking about, is there? So, Dr. Rayer, in his report, says, I am sending him — I want him to go to his general — his own personal physician to address these other issues that he's having. So Dr. Rayer wasn't saying that he's completely all better. He's saying he's completely all better with respect to the lumbar strain. He said he can return to work full-time without restriction. He didn't say that he was a psychological genius. He didn't say he had no other problems in his life. He just said he can return to work without restriction. That's all the company needs to know, isn't it? As far as the claim goes, he's saying he can go back to work full-duty as far as the claim goes. Now, it doesn't — you have to — there is — the way that workers' comp claims work, you have certain body parts, certain conditions that are accepted. The doctors you're seeing for that will only address those issues. If it's not in the claim, the doctor's not going to see it. So he's saying from the standpoint of this strain, this lumbar strain, I'm all done with him. He's all done. I could release him. He would be full-duty as to that. Do you want to save any of your time, counsel, your continuation? I better, Your Honor. Thank you. OK. All right. So let's hear, then, from Mr. McGuire. Good morning, Your Honors, and may it please the Court. My name is Jonathan McGuire, here on behalf of Respondent Nevada Goldmines. The Court has correctly analyzed the issues surrounding the October 2, 2019 Certification of Disability form, and I wanted to go over some of those details. It's located at 4 ER 0865. In that section, Dr. Rayer says that the ---- I'm sorry. Where are you? Sorry? What was the site? 4 ER 0865. OK. Thank you. This is the Certification of Disability form that this Court has been referencing. In that particular form, again, it's titled Certification of Disability. Nothing about a worker's comp claim, or limited, for that matter. It goes over and says that Mr. Ulloa is returned to full duty with no restrictions as of October 2, 2019, that he did not suffer a permanent disability, and the accompanying narrative that is located, if you just flip back two pages, clearly demonstrate that Ulloa was returned to full-time, full-duty work, and has suffered no permanent disability, and he will be released from care at this time. The objective medical evidence available to the employer at the time of termination was that Ulloa was not disabled under the ADA, such that he could be returned to work in his entirety. Counsel, let me ask you this. You heard opposing counsel dispute the idea that Mr. Ulloa was compensated fully during the time he was basically on leave. What's your response to that? Several layers of responses, Your Honor. In the first instance, we shouldn't get too caught up with whether it's paid leave or unpaid leave, because this Court's precedents support that a continued FMLA leave, which is unpaid, can in fact be a reasonable accommodation. That's this Court's opinion in RANA.  But I think we're asking for was he paid or not. And he was, Your Honor. His own admission admits that he was paid. Mr. Kemp's quibble that he has with the record indicates a subsequent attempt by the third-party administrator to get some of that money back. It's not about whether he in fact was paid. It's about whether the money should have been given back to him. That is, if I might, Your Honors, for the purposes of the paid leave, Mr. Ulloa says in his charge of discrimination that he signed under oath to the EEOC, I was placed on paid workers' compensation leave. He's on paid leave for the entirety of the time. What's the cite on that? That's 1 S.E.R. 173. Was he ever required to pay any of it back? No, Your Honor. I don't believe so. I believe that those — I know that that is in the record. I do not know it as an absolute fact with a citation for you. However, I can tell you that he received paid leave from Barrick. He received total temporary disability payments. And then he received paid suspension investigative pay from October 2, 2019, through his termination. So, yes, he was paid for the entirety of the time. And there is nothing in the record that would support the opposite. So he was paid his full salary that entire time? No, Your Honor. TTD benefits are only 66 and two-thirds of an employee's salary. As it pertains to the period of time — so there is — the slight complication here is that he was paid different rates. He was paid his full rate, he was paid TTD, and then he was paid his full rate again. However, at no point in time did he receive less than 66 and two-thirds of his salary. Does that include workers' comp? I'm sorry, Your Honor. I didn't understand the question. Does that include workers' comp payments? The TTD temporary total disability payments are the workers' compensation benefits. And opposing counsel's argument is, well, if the law requires you to pay it, then it's not a reasonable accommodation. That's faulty reasoning, Your Honors. FMLA is required to be paid, and yet we still allow that to be a reasonable accommodation. Of course, a continuation in a party's compliance with its legal obligations is still, in fact, going to be seen as appropriate and reasonable leave. Because he was accommodated with leave the entire time, it moots the entirety of the failure-to-accommodate claim. Mr. Kemp's argument is, well, he asked to change right there at the end, at which point in time he was placed on administrative leave, the quintessential element, which is you are removed from the entirety of your duties during that period of time. Thus, it's clear he was accommodated with leave the entire time the failure-to-accommodate claim simply falls apart. Let me ask you this. Are there some limits on when a paid leave amounts to a reasonable accommodation? For example, could an employer keep an employee on paid leave indefinitely as a reasonable accommodation and never have to bring him back to work? I would actually invert your question, Your Honor. The question is, can an employee require an employer to keep them on paid leave indefinitely? And the answer to that question is no. Indefinite leave is not seen as a reasonable accommodation that an employer must provide. However, if an employer chooses to exceed their legal obligation and provide that leave, I do believe that that would be a reasonable accommodation under the ADA so long as it's supported by the medical evidence. And that's the key, right? When you're using medical evidence and when you're looking at leave as a reasonable accommodation, you want to try and sync up. Is there a potential that this employee, if provided this leave, will be able to return to work? If there's a potential there, then providing the leave is a reasonable accommodation. If there is no potential, Your Honor, I think you have a fair argument that that would not be reasonable. And this ---- There's been a discussion about your client, I mean, his client, being asked to return a portion of a payment. What was that? Your Honor, I believe that was a dispute regarding the amount of TTD that he had been provided. That is in the July 1st, 2020, and that's located in the record at 3ER0397. It's regarding TTD benefits that are a full year after termination. The leave that we're talking about is in July of 2020, not prior to his period of time in which he was, in fact, still employed. He continues to receive these benefits even after he's no longer employed. And this is an important part for this Court's analysis. The TTD benefits and the workers' compensation claim run separate from the ADA analysis and the accommodations that he's being provided. One can satisfy another obligation, but the compensability of the injury is treated differently from the discipline that arises from the failure to report. What did you guys know about the herniated discs? Your Honor, that particular MRI report is incorporated into virtually every medical record from the date the MRI happens forward. There is there is the court was clearly asking for a direct answer on what's where's the expert report on this particular issue. There is no expert report. There are only non-retained experts in this case. So what Mr. Kemp is trying to do, and I do not believe that he disclosed any expert witnesses in this case. The only person that's disclosed any expert witnesses is the defendant. So I don't believe that there is truly an expert opinion on this exact question. However, that MRI report and Dr. Ryer's evaluation of the report is incorporated into every medical record, and we cited it in the briefing, every medical record from then moving forward. Dr. Ryer Ryer had the MRI as well. Yes. And he read it and he determined that it was not significant. And he diagnosed him with a lumbar strain and proceeded forward. And that's consistent with all the medical documentation, Your Honors. If I might jump over to the qualified individual analysis under the disparate treatment claim, because I think the failure to accommodate claim, it's clear, summary judgment was proper. Mr. Ulloa runs into an immovable object on the qualified individual analysis because of his own admissions. For his disparate treatment claim, Ulloa cannot show even a genuine dispute of material fact that he can get past summary judgment as to the second step of the qualified individual problem. At his deposition, Ulloa testified when he was asked about an August 2019 disability benefits application, did you believe you weren't able to do your job, but you thought you would be able to in three months? He answered, not after the pain got worse. I knew I wasn't going to be able to come back. That's at 4 ER 0709. This is his admission regarding his own condition about whether he could return to work as a haul truck driver. He says he knew he wasn't going to be able to. He also admitted in his intake inquiry to NERC that from June 4th, 2019 to April 23rd, 2020, he, and I'm directly quoting, had to spend most of his day lying down. That's at 3 ER 0482. There is simply no argument on these facts that Ulloa was a qualified individual under the analysis that this Court has adopted. Secondly, and independently, Ulloa cannot demonstrate that he was a qualified individual because he engaged in repeated acts of misconduct. This Court has characterized misconduct, especially that which threatens the safety of others, can render an employee unqualified. That's this Court's opinion in Mayo. Ulloa had not one but two serious safety violations in the just over a month before he was eventually placed on leave, rendering him unqualified. On May 2nd, 2019, he was – received written discipline for ignoring critical safety alerts and violating Barrick's fatigue management system. And then a month later, he receives the failure to report an incident and injury preventing inspection of a safety risk. This repeated acts of misconduct indisputably creates an issue where Ulloa has a – demonstrated a pattern of disregard for his colleague's safety. It also prevented the prompt and appropriate investigation by Barrick of his failure to report the incident, including drug and alcohol testing, which is absolutely crucial in terms of the post-accident investigation. As it pertains to causation for the purposes of his disparate treatment claim, Ulloa cannot argue that there's any element of causation here because the day he reports the incident is October 6th, 2019. October 7th, 2019, Barrick fills out the C-3 form. And in response to the prompt, if the validity of the claim is doubted, state the reason. Barrick types questioned late report per Barrick policy. What happens next is absolutely irrelevant for the fact of at that time, the day after the incident, Barrick already suspected a policy violation had occurred and it wanted to discipline him regarding it. And the test that Mr. Ulloa has to pass is the discrimination would not have occurred but for the wrongful actions of the employer. No one knew that Ulloa would allegedly in the future sometime develop a disability as of June 7th, 2019. And as a result, causation is absolutely negated. If I might briefly, Your Honors, go over the legitimate nondiscriminatory reason. Even in the event this Court decides I can get past the Prima Fascia case, we can get there. I want to know more about Barrick's legitimate nondiscriminatory reason. It is absolutely proper and consistent the entirety of the way through the record. Barrick's standards of conduct policy say that a failure to report an on-the-job or job-related environmental, safety, or health injury or incident is a violation of these standards of conduct. Similarly, in another document Ulloa received in the unacceptable behavior section, it says failing to report an incident. As I just mentioned to you, the day after Ulloa reports the incident, Barrick signs on the C-3 form that they are doubting it, noting that it's a late report per Barrick policy. And then Ulloa is provided the leave that he was given. In the discipline notes, which was part of the investigation of his failure to report, Lisa Chamberlain notes that the Ulloa's violation was failing to report an incident or injury. And then in his termination letter on October 16th, 2019, he's written up for an incident that occurred on June 4th that you did not report to your supervisor until June 6th. That's the same reason all the way through, over and over and over again. Ulloa failed to report an incident, an injury, and as a result, he knew that he was going to be termed. Kennedy. I think you've already given us some background on this, but as you know, Mr. Ulloa argues that the company's reasons for termination were entirely pretextual. What's your response to that? Absolutely, Your Honor. Ulloa has a number of pretextual theories that he throws at the Court. None of them can get past the admitted documents that we have and Mr. Ulloa's admissions in those documents. As it pertains to Ulloa's theory that you change the definition of immediate. In other words, that document doesn't include the word immediate, and therefore it's a false reason. You're changing your reason. There are no less than Ulloa admits that it was immediate reporting five times. Steve Linskog, his supervisor, admits that it's immediate reporting two times. Dan Reese admitted that it four times. Lisa Chamberlain admitted it three times. And Tony Daniels admitted it once as well. There's no argument that there was any change here. There's no genuine dispute. It was immediate reporting. Everybody knew it. In fact, every witness that was asked testified consistently with that expectation. If the Court has one of Mr. Ulloa's theories of pretext in mind, I'm happy to respond to it directly. However, I think he's wholly failed to carry his burden at this stage to demonstrate some pretextual reason that would prevent summary judgment on this case. So basically, your argument is that by his own admission or statements, he has undercut the pretext argument. Absolutely, Your Honor. And there's a number of different ways that that is true. Mr. Ulloa's other theory is, well, you delayed in your investigation of me, and that somehow creates this issue, right? But Mr. Ulloa's own statement, as early as June 25th, and this is in the record at 4 ER 0932, Ulloa's own statement to his doctor says, Bev, that's Beverly Grover, a Barrick employee, has told me the incident was under investigation and that I had to wait to come back to work anyway, so I have been off since. June 24th, 29th, same month, he gets injured. He's not returned to work until October. He knew the whole time that this was going to be investigated. Barrick provided him with that leave to his benefit, so that he could have an opportunity to recover, so that he could not have to worry about the stress of the investigation while he recovered and he could continue to receive those benefits. It also, admittedly, operates to Barrick's benefit, because they're able to avoid interference claims under any of the contemporaneous or overlapping protected leaves. So it's beneficial for everyone involved to allow the employee to not complete the investigation until after they've been returned to work. As this Court knows, when Dr. Ryer returns Ulloa to work full duty with no restrictions on October 2nd, 2019, Barrick completes their or continues their investigation that had been paused when he was put out on leave, determines he failed to report an incident and injury, and properly proceeds with the adverse action. Your Honors, with the brief amount of time I have left, I wanted to add that there is significant additions in the record to citations to the record in the opening and reply briefs that the District Court did not have the benefit of, and I believe that's proper for this Court to consider. Thank you. Thank you very much. All right. Mr. Kemp, you have a little rebuttal time. Thank you, Your Honors. So the appeals officer decision is at 2 ER 103 to 108. He was not paid for that time period. He had to go through months and months of litigation in order to get the benefits he was entitled to. They weren't just paying him, as was stated. The policy violation is interesting. The policy does not say immediate, and when we questioned people, they said, well, what you have to report is if there's something that causes damage to the equipment that makes it inoperable, or there is an actual injury, then you report that immediately. There was no damage to the equipment here. And Mr. Ulloa did not realize until two days later that he was actually injured. This is tough work. This is working at a mine. They get banged around all the time. So if they reported every time, they would do nothing but investigate these things. And so they say, no, if you really are hurt. He doesn't know that for two days. With respect to the EEOC charge, that is either incorrect or misleading. I mean, he the other thing was the leave, reasonableness of leave. I only have 20 seconds. I want to make this clear. There's no way it's a reasonable accommodation for an employer to say, you know, we're just going to put you out on leave and starve you until you get tired and leave. Only if an employee asks for the leave, if they say, I need leave for two months because I've got to go through this treatment and get better, that would be reasonable. But an employer forcing it on an employee, unpaid leave, that doesn't allow them to work. That's not a reasonable accommodation. There's no way it can be. I'm sorry I'm out of time, Your Honor.  Thank you. Other questions by my colleagues? Thank you both for your argument. The case of Ulloa v. Nevada Goldmines is submitted.
judges: THOMAS, SMITH, Rayes